BUHLER, Respondent, vs. DEPARTMENT OF AGRICULTURE AND MARKETS and another, Appellants.

*May 19—November 9, 1938.*

134

For the appellants there were briefs by the *Attorney General, R. M. Orchard,* assistant attorney general, and *Fred M. Wylie,* special counsel, and oral argument by *Mr. Wylie* and *Mr. Ralph T. Runge,* special investigator.

For the respondent there were briefs by *Wilbershide, Baumblatt & Storms* of Racine, and oral argument by *L. P. Baumblatt.*

The following opinion was filed June 21, 1938:

FRITZ, J.  During 1936 and 1937 the plaintiff, Louis Buhler, Sr., was a retail milk dealer under licenses issued by the defendant, Department of Agriculture and Markets (hereinafter called the "department").  On November 24, 1937, a complaint was served on the plaintiff in which the department charged that,—

"2.  Said Louis Buhler, Sr., has violated the provisions of General Order 56g7 of the Department of Agriculture and Markets, applicable in the Racine regulated milk market, by failing to pay producers for milk and cream delivered to him by such producers in the months of August, September, and October, 1937, at the prices required by said general order and also by failing to pay such producers for milk and cream delivered to him by them in said months at the times required by said general order.

"3.  Said Louis Buhler, Sr., is unfit and unequipped by reason of insufficient financial resources and responsibility for the business of a milk dealer.

"Wherefore the department gives notice of a hearing . . . to determine the truth of the foregoing allegations and to determine what order shall be issued if said allegations prove to be true."

In answer thereto Buhler denied that he had failed to pay for deliveries by producers at the prices required by the general order; but admitted that he had failed sometimes to pay therefor within the period prescribed by the order.  He denies that he was unfit and unequipped by reason of insuffi-

cient financial resources and responsibility to be a milk dealer, and alleged that he had incorporated and would shortly arrange to get over $9,000 additional capital into the business. Before there was a hearing pursuant to the complaint Buhler applied for a new license for 1938, and at a hearing on December 8, 1937, he and the department stipulated that the hearing on the application to revoke his 1937 license should govern the department in determining whether a license should be issued for 1938. After a final hearing on December 28, 1937, the department signed and entered the following findings, conclusions, and order on December 30, 1937, to wit:

"Proceedings having been had under section 100.03 (4) (c) of the statutes, upon notice, complaint and hearing, upon application of Louis Buhler, Sr. (Mari-Gold Dairy), for dealer license under section 100.03 of the statutes,

"Now, therefore, upon such proceedings and upon the evidence therein, the department makes the following

### "Findings and Conclusions

"The allegations of the complaint are established and the applicant is unfit and unqualified for the business.

"Wherefore, upon the proceedings and the evidence and the foregoing findings and conclusions, the department issues the following

### "Special Order

"The application of Louis Buhler, Sr. (Mari-Gold Dairy), 1009 Monroe avenue, Racine, Wisconsin, for 1938 dealer license under section 100.03 of the statutes is denied.

"Madison, Wisconsin, December 30, 1937.

"By the Department:

"Charles L. Hill, Chairman.

"F. Schultheiss, Commissioner."

That order was vacated and set aside by the court in this action on the ground that "there are no legal findings whatever" as basis therefor; and that as the statute required the

department to issue licenses to applicants who are "fit and *equipped*" for the business, it was without power to deny a license upon a finding that an applicant was "unfit and *unqualified.*" The statutory provisions applicable to the issuance, denial, or revocation of such a license, and to the powers, findings of fact, and orders of the department, and the judicial review thereof, are as follows:

"100.03 (4) (a) No person shall engage in business as a dealer without a license therefor under this section. . . .

"(b) . . . All licenses shall expire on December thirty-first in the year for which issued.

"(c) The department shall issue license to each person making proper application and who is fit and equipped for the business. License may be denied, suspended or revoked by special order after notice and hearing as provided in section 93.18, when the applicant or licensee is unfit or unequipped for the business.

"(d) Under paragraph (c) the department shall consider, in addition to other matters, the character and conduct, including past compliance or noncompliance with law, of the applicant or any person to be connected with the business, and the financial responsibility of the applicant. The department may at any time require an applicant or licensee to file with it a surety bond conditioned for the prompt delivery of the price to producers. . . .

"(7) All questions of fact under this section shall be determined by the department, in written findings, and the provisions for judicial review of orders or regulations made under this section shall be as prescribed in chapter 102 in so far as the provisions thereof are applicable."

It is true that in so far as there can be deemed to be any finding of fact in the department's so-called "findings and conclusions," upon which its special order denying the license is based, the findings are so general,—instead of specific,—in form, and but mixed conclusions of fact and law to such an extent, that they do not fairly or reasonably comply with the requirement in sub. (7) of sec. 100.03, Stats.,

that "all questions of fact under this section shall be determined by the department, in written findings." As the learned circuit judge rightly stated in his decision,—

"Unfortunately the record is in a deplorable condition. . . . No record dealing with human rights should be in the condition this record is in. While it is not expected that hearings held by state commissions and state departments shall measure up to the strict rules demanded in judicial proceedings, nevertheless, the findings made by the state commissions and state departments are just as far-reaching within their respective fields as are the judgments of courts. Furthermore, it must always be remembered that a litigant has the same right to a full, fair and orderly hearing before a state commission or a state department as in a court of justice. A denial of a right or a loss of property is just as much and as serious a denial of legal right, or legal loss, whether it results from a hearing held before a state commission or a state department, or whether it results from a hearing held in a courtroom. The necessity for a full, fair and orderly hearing before a state commission or a state department is all the more required because it forms the sole basis of the findings by such commission or such department, and such findings are binding upon this court and the supreme court, if there is any credible evidence to sustain such findings."

The importance of and necessity for specific and adequate findings as to all disputed ultimate facts essential as basis for decisions and orders made by administrative departments or commissions, as well as by judicial tribunals has been repeatedly emphasized by this court in a number of cases. See *Tesch v. Industrial Comm.* 200 Wis. 616, 229 N. W. 194; *State ex rel. Progreso D. Co. v. Brokers Board,* 202 Wis. 155, 231 N. W. 628; *United Shoe Workers, etc. v. Wisconsin L. R. Board,* 227 Wis. 569, 279 N. W. 37; *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 279 N. W. 673. For the reasons stated therein, the practice prescribed should be fairly and fully complied with by

every department and commission, as well as judicial tribunal, in deciding any matters within its jurisdiction in relation to rights, duties, or obligations of parties thereto. This court's criticisms (in such cases as *Milwaukee Nat. Bank v. Gallun,* 116 Wis. 74, 92 N. W. 567; *Burke v. Sidra Bay Co.* 116 Wis. 137, 141, 92 N. W. 568; *Chippewa Bridge Co. v. Durand,* 122 Wis. 85, 91, 92, 99 N. W. 603; *Closuit v. John Arpin Lumber Co.* 130 Wis. 258, 261, 262, 110 N. W. 222) of findings in such general form as "all allegations of the complaint are proved," etc., and the absence of specific findings as to the essential ultimate facts in dispute, are as applicable to findings made by official administrative agencies as they are to findings made by courts. However, it has also been frequently held that absence of such specific findings does not necessarily constitute reversible error, and that such findings though general in form may nevertheless be sufficient to support the adjudication. *Wrigglesworth v. Wrigglesworth,* 45 Wis. 255; *Milwaukee Nat. Bank v. Gallun, supra; Farmer v. St. Croix Power Co.* 117 Wis. 76, 93 N. W. 830; *Chippewa Bridge Co. v. Durand, supra; Wallis v. First Nat. Bank,* 155 Wis. 533, 145 N. W. 195; *Finkelstein v. Chicago & N. W. R. Co.* 217 Wis. 433, 438, 259 N. W. 254.

In the case at bar the appellants contend that if findings in the verbatim language of the complaint would support a denial of the license, then the department's so-called "findings and conclusions" that "the allegations of the complaint are established," and that "the applicant is unfit and unqualified for the business" are likewise sufficient to support the denial of the license. That contention is sound. By its omnibus, but unambiguous, statement that "the allegations of the complaint are established," the department definitely found in effect that,—as is alleged in the complaint,—Buhler had failed (1) to pay producers for milk and cream delivered to

him by them in August, September, and October at the times required by its General Order 56g7, and (2) to pay such producers therefor at the prices required by that order; and (3) that by reason of insufficient financial resources and responsibility for the business of a milk dealer he is, as the department found specifically, "unfit and unqualified for the business." Moreover, the record discloses that evidence introduced and admissions made by Buhler conclusively establish his noncompliance in the respects alleged, and that even the insufficiency of his financial resources and responsibility, and his consequent unfitness for the business appear to a considerable extent without material dispute; but that to excuse his defaults and lack of sufficient working capital, responsibility, and fitness, he relied rather on other matters, by virtue of which he had been endeavoring and hoped to be able in the near future to better his condition in those respects. Thus, Buhler's failure to pay producers by the 20th day of the month following delivery as required by the general order was even admitted in his answer; and his defaults in that respect were as follows:

On Sept. 30....$2,332.80   unpaid for August milk—due Sept. 20
Bank Acct. not shown

On Oct. 31....   442.69   unpaid for August milk—due Sept. 20
       2,399.02   unpaid for Sept. milk—due Oct. 20

    $2,841.71   total overdue for Aug. and Sept. milk
      652.95   cash in bank

Deficit in money
  on hand .....$2,188.76   without considering indebtedness for milk delivered in October

On Nov. 30....$ 293.04   unpaid for Sept. milk—due Oct. 20
      1,771.05   unpaid for Oct. milk—due Nov. 20

    $2,064.09   total overdue for Sept. and Oct. milk
Bank overdraft .  318.27

Deficit in money
  on hand .....$2,382.36   without considering indebtedness for milk delivered in November

On Dec. 28....$ 433.55 unpaid for Oct. milk—due Nov. 20
            2,684.65 unpaid for Nov. milk—due Dec. 20
            ─────────
            $3,118.20 total overdue for Oct. and Nov. milk
Bank Acct. not shown

Likewise, Buhler virtually conceded, during the course of the hearings, that for May, August, and September, 1937, he had not paid producers at prices required by the department's general orders, although he had denied such failure in his answer. But during the hearing he claimed that the failure was due to a misunderstanding on his part as to the amount which he was to pay in those months under the order; and it is true that the discrepancies are not large.

On the other hand, Buhler by way of excuse for his failure to pay within the prescribed time, and in connection with denying the charge that he was unfit and unequipped by reason of insufficient financial resources and responsibility for the business of a milk dealer, claimed that his defaults occurred because the expansion of his business required the investment of his profits in trucks and similar equipment in order to handle his increasing volume of business; and in his answer he alleged that he had incorporated and would shortly arrange to get over $9,000 in additional capital. In support thereof he introduced evidence that he had secured stock commitments aggregating approximately $9,000 from his producers, who agreed to subscribe for stock on the basis of $100 per share for each two thousand pounds of milk shipped the respondent per month, and to pay for the stock by allowing twenty-five cents to be deducted by him for each one hundred pounds of milk delivered. But the record discloses that in similar proceedings to revoke Buhler's license in 1936 for failures to pay producers within the time prescribed by the department's order, he had also represented that he was about to secure more working capital; that he had evidently failed to do so during the year which followed; and that in the meantime the monthly arrearages in

amounts overdue to producers were apparently increasing. He did produce financial statements which, although rather incomplete in details, purported to show an increase of about $3,200 in his net worth, *i. e.,* from $7,191.38 on November 20, 1936, to $10,394.83 on November 30, 1937,—and his accountant testified that seventy-five per cent of the fixed assets inventoried at $15,461.66 on November 30, 1937, could be put on the market and sold for the inventoried amount. However, in passing upon the bearing of that increase on the issues of the sufficiency of Buhler's financial resources and responsibility and his consequent fitness and equipment for the business, the department could also take into consideration his limited bank balances, and even deficits in his bank account, and the inadequacy thereof in view of his relatively large past overdue indebtedness to producers for two and three months; and also his inability theretofore to file with the department, under sec. 100.03 (4) (d), Stats., a surety bond "conditioned for the prompt delivery of the price to producers." Under those circumstances, it was within the jurisdiction of the department to determine that Buhler was unfit or unequipped for the business in view of his character and conduct in not complying with the law (which includes the department's general orders. Sec. 100.03 (5), Stats.) and his insufficient financial responsibility; and that therefore the license should be denied unless his noncompliance or inability under such circumstances do not constitute an adequate basis as a matter of law, under sub. (4) of sec. 100.03, Stats., for such an order.

The provisions in pars. (c) and (d) of sub. (4) of sec. 100.03, Stats. (quoted above), were clearly applicable to Buhler, as an applicant for a license for 1938; and under those paragraphs the department was expressly directed, in determining whether an applicant was "unfit or unequipped for the business," to "consider, in addition to other matters,

the character and conduct, including past compliance or noncompliance of the applicant . . . with law and the financial responsibility of the applicant." Thus, by expressly requiring consideration of his "past compliance or noncompliance with law" and his "financial responsibility," the legislature has evidenced its intention to empower the department to conclude that an applicant is "unfit or unequipped for the business," and that a license could therefore be denied if it found that in the conduct of his business he had failed to comply with general orders like No. 56g7, *or* that he was lacking in financial responsibility by reason of matters such as insufficient net worth, working capital, or inability to file the authorized surety bond. Consequently Buhler's admitted failures to make payments within the time prescribed by the department's orders could alone be considered sufficient to warrant the denial of the license. But the department certainly had that power upon taking into consideration also his failures to pay at the prices required under its orders for deliveries in May, August, and September, 1937, and the proof as to his limited net worth and concededly insufficient working capital and inability to file the surety bond. It follows that the department's determination that the evidence established the allegations in the complaint, including that Buhler was "unfit and unequipped by reason of insufficient financial resources and responsibility for the business of a milk dealer," that he was "unfit and unqualified for the business," and that therefore the license should be denied, must be sustained.

The fact that the department used the word "unqualified" instead of "unequipped" in concluding that Buhler was "unfit and unqualified for the business" is not of fatal consequence. As the statute reads that a "license may be denied, . . . when the applicant . . . is unfit *or* unequipped for the business" (sec. 100.03 (4) (c), Stats.) and does not

read "unfit *and* unqualified," it is not necessary for the department to find and conclude that an applicant is "unequipped," as well as "unfit," in order to warrant the denial of a license. Consequently, the existence of but one or the other of those conditions, *i. e.,* either "unfit" or "unequipped," is sufficient basis for the denial. Furthermore, although the words "equip" and "qualified" are not synonymous in all respects, there is such an overlapping in their definitions that,—in so far as the use of the word "unqualified" instead of the word "unequipped" is concerned,—there was virtually no substantial difference between the meaning of the term "unfit or unequipped for the business," as used in the statute, and the term "unfit and unqualified for the business," as used in the department's findings and conclusions. In so far as the word "equip" is defined to mean "to provide all that is necessary for a successful undertaking," it can be considered to include sufficient net worth, and working capital and consequent financial responsibility, as well as trucks or apparatus, etc., necessary to successfully conduct a business. As possession of equipment in all such respects is essential to qualify an applicant for a dealer's license,—and he can be considered unqualified when there is a lack of equipment in any of those essential respects,—the word "unqualified" when so used can be considered to mean the same as if the word "unequipped" had been used. Under such circumstances, the words "unequipped" and "unqualified," can be deemed to express substantially the same meaning, and consequently the term "unfit and unqualified," as used in the department's findings and conclusions can be considered synonymous with the term "unfit and unequipped."

No question is raised on this appeal in relation to the validity or constitutionality of sec. 100.03, Stats., or the general or special orders involved herein. The constitution-

ality and validity of "Emergency regulation of the distribution of milk in certain municipalities" (sec. 100.03, Stats. 1935) and departmental orders made thereunder, which were similar in some respects to the statute and orders involved herein, were passed upon and sustained in *State ex rel. Finnegan v. Lincoln Dairy Co.* 221 Wis. 1, 265 N. W. 197, 265 N. W. 851, but we are not required to pass upon any such issue in this case.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment confirming the special order made by the Department of Agriculture and Markets on December 30, 1937.

FOWLER, J. (*dissenting*).   I think the judgment of the circuit court should be affirmed.   The complaint made by the Department of Agriculture and Markets of its own motion charges three facts and three only, (1) that the plaintiff violated orders of the department applicable to the Racine market fixing the price of milk to be paid to the producer, and (2) that he violated an order of the department requiring that producers should be paid on the 20th of each month for the milk delivered by them during the month previous. These allegations are followed by the general allegation, (3) that the plaintiff "is unfit and unequipped by reason of insufficient financial resources and responsibility for the business of a milk dealer."

The department made an order denying the plaintiff's application for a license that recited as "Findings and Conclusions" that "the allegations of the complaint are established and the applicant is unfit and unqualified for the business."   There is nothing to show whether the department denied plaintiff a license because of establishment of (1), (2), or (3), or two of them or all of them.   The statute provides that a license may be denied if the applicant is

"unfit or unequipped" for the business of a milk dealer, but whether he is "unfit or unequipped" is like a conclusion of law which must have as basis to rest upon specific findings of fact adequate to support the conclusion. An order denying an applicant a license should show the specific fact or facts on which the finding that the applicant is "unfit or unequipped" is based. Otherwise the court on review cannot determine whether the denial of the license was justified. The instant case illustrates this. The evidence shows that the plaintiff did in a few instances pay the producers less by trifling amounts than they were entitled to, but the plaintiff claims these trifling mistakes were due to errors in computation or in some instances to a misunderstanding as to compulsory deductions. To refuse the plaintiff a license because of this alone would in my opinion be manifest error. Also, the evidence shows that the plaintiff did fail, in many instances to pay his producers at the time fixed by the department's order, but to deny him a license because of this alone would in my opinion be error. In my opinion also there is no sufficient basis for denying the plaintiff a license because he has not more capital, if in any case the department may constitutionally deprive a man of his right to do business merely because he has not as much capital as the department considers essential to enable him to do so. The plaintiff is not insolvent. He has net resources to the amount of approximately $10,000. In his course of business for four years every producer has been ultimately paid every cent due him, except for the month preceding the instant hearing. No producer is complaining. From the evidence it is plain that the producers are satisfied and desire that plaintiff be permitted to continue in business. They being satisfied, it is difficult to see why anyone else may rightfully interfere in their behalf with his so doing.

The plaintiff has been denied the right to do business as a milk dealer because in the opinion of the department he is

"unfit and unqualified" to do such business. The statute by its terms authorizes the department to deny a license when the applicant is "unfit or unequipped." I think the proper— the only reasonable construction of this provision is—that a dealer is "unfit" when from personal habits or otherwise he delivers to his customers milk that is unsanitary or deficient in quality or quantity, and he is "unequipped" when his machinery or place of operation is insufficient or unsanitary so that he cannot deliver milk in proper condition. The finding in this case is that the plaintiff is "unfit and unqualified." "Unqualified" means the same as "unfit." There is no allegation of unsanitary conditions of equipment or place of operation or of any improper condition of the milk delivered. Words in a statute should be given their ordinary meaning. The ordinary meaning of "unequipped" is want of equipment, and equipment is commonly understood to relate to machinery and place of operation. Want of capital is not want of equipment. One is not "unequipped" merely because his capital is insufficient. There is here no finding that plaintiff is "unequipped," and no evidence that he is "unfit," within the meaning of the term above indicated. There is thus no basis formed for denying the plaintiff a license.

But the refusal of the department to grant the plaintiff a license was in my opinion erroneous for much graver and more fundamental reasons than those above given. Many kinds of business may be regulated by law, but none can be prohibited unless it somehow affects public health, public safety, public morals, or public welfare. *State v. Withrow,* 228 Wis. 404, 280 N. W. 364. The plaintiff's business affects the public in none of these ways. It is not charged or claimed that the plaintiff's manner of conducting his business affects the public in any one of the three respects first named. The only way the public welfare could be otherwise affected would be by fraudulent practices, but the plaintiff

has been four years in business, and it is not charged or claimed that in this period he has ever defrauded anybody. He started "from scratch," and in four years has built up an extensive and remunerative business. As this business expanded he has been obliged to purchase equipment, particularly trucks, on credit. Necessity for payment of equipment is as imperative as payment to producers. Payment to all producers precisely on the 20th of the month has at times been impossible. In such circumstances some latitude should be allowed. For the department to go the limit of its expressed statutory power, regardless of a dealer's inherent rights, when no public interest required such action was oppressive. It was an abuse of discretion; it was an abuse of power. The plaintiff's business is taken from him with less concern, apparently, than one would show in taking a bone from a dog. That the plaintiff can be deprived of his business merely because the Department of Agriculture and Markets thinks he should have more capital so that he can pay his producers on the exact day they have set for such payment, seems to me monstrous. We have here a department that is complainant, prosecutor, and judge. It is true administrative boards with powers so to function have been sustained as constitutional, but if such a board is by the terms of a statute given a power that courts are not given under our system of government, it would seem that in the execution of that power they should be subject to the same restrictions and limitations that courts are subject to in executing their powers. Courts cannot abuse their discretion or their powers. No *nisi prius* court would be permitted by an appellate court to do what has been done by the department in this case. It would seem *a priori* that the proper and only constitutional way to proceed in case of violations of the orders of the department fixing the time of payment to producers, and in the instant case that is the only thing that calls

for any action by the department, would be to apply to the courts for an injunction as provided by sub. (6) of sec. 100.03, Stats. It would *a priori* seem that compliance with such orders should be enforced in the manner that orders of administrative boards are commonly enforced, by applying to the courts to compel obedience. Courts enforce orders of such boards by imposing fines for disobedience, when such imposition is provided for by statute, or by the injunctive process. Courts concede to violators of regulative orders of administrative boards the right to continue in business. They only compel submission to regulation. They cannot prohibit the violator from doing business. That is confiscation. Confiscation of a property right or a personal right, and both are here involved, can no more be accomplished through administration of a licensing statute than in other ways.

Some of the statements above made touch constitutional questions, and no constitutional question has been expressly raised in the brief of respondent in this case. Courts do not ordinarily reach out to seize constitutional questions when the parties to the case have not raised them. But on proper occasion it has been done. In the case of *Stierle v. Rohmeyer*, 218 Wis. 149, 260 N. W. 647, we did so. The occasion was that a note on which approximately $5,000 was due, secured by a mortgage on real estate and some personal property, had been by the circuit court declared paid and canceled under a statute because the conduct of the mortgagee on seizing a small amount of personal property under the chattel mortgage also securing the note, did not comply strictly with the terms of the statute prescribing conduct in enforcing a chattel mortgage and the statute provided that upon noncompliance the debt should be adjudged paid. The judgment of the circuit court destroyed practically the entire property of the mortgagee and was palpably unjust. The

statute relied on to support the destruction was *a priori* unconstitutional. The court invited briefs upon the constitutionality of the statute in order to protect the mortgagee, in case on due consideration of the constitutional question the statute was determined to be invalid. The business of which the plaintiff is deprived in the instant case is perhaps more valuable than was the note involved in the *Stierle Case, supra,* and the injustice of the order of the department here involved seems to me as manifest as was the deprivation of the mortgagee in that case of his note. It seems to me that invitation of briefs on the constitutionality of the provisions of the statute relied upon by the department might well be invited here, if adjudication of unconstitutionality is essential to protection of the plaintiff's inherent personal and property rights. Courts are not required to sit idly by and see parties before them deprived of their inherent constitutional rights merely because their counsel did not assign as error the deprivation of those rights. Courts are not so impotent to prevent confiscation of property rights. It is true that the constitutionality of the act giving to the Department of Agriculture and Markets jurisdiction to regulate the milk business has been upheld. *State ex rel. Finnegan v. Lincoln Dairy Co.* 221 Wis. 1, 265 N. W. 197, 265 N. W. 851. But the portions of the act here relied on were not involved in that case. The act contains a severability clause, and the provisions here involved are subject to attack notwithstanding the decision in that case.

A section of the reply brief of counsel for the department is headed: "Perhaps judicial impartiality may require a warning to lower courts." The suggestion is at least as applicable to the administrative boards of the state as to trial courts. The department could not rightly complain if the court gave to them the admonition for fairness and justice

and adherence to accepted principles of law that they would have us give to courts. I think such admonition should be here given.

A motion for a rehearing was denied, with $25 costs, on November 9, 1938.